Good afternoon this is the time set for argument and Jones v. Ryan and Ms. Bass you may proceed. Thank you your honor may it please the court my name is Amanda Bass I'm with the Federal Public Defender's Office for the District of Arizona together with Leticia Marquez I represent the petitioner appellant Danny Lee Jones. With the court's permission I'd like to address the three and I will do my best to watch the clock and try to reserve five minutes of my time for rebuttal. There are two issues before this court with respect to these IAC claims. The first issue is whether this court can get to de novo review of these claims and if so how. The second issue is whether on de novo review Mr. Taking the first of those issues this court can review Mr. Jones's IAC claims de novo because the state courts adjudication of these claims was premised on unreasonable factual determinations under 2254 D2. As the district court found when it granted Mr. Jones an evidentiary hearing on these issues in 2006 the post-conviction court prevented Mr. Jones from developing evidence that went to the core of these IAC claims when it denied his request for a neuropsychologist. Not only was that expert assistance critical to Mr. Jones's ability to prove his entitlement to relief on the merits but Mr. Jones also had a statutory entitlement to that expert assistance that the post conviction court denied him. In Brumfield versus Kane the Supreme Court held that where a state court adjudicates a federal claim after denying a petitioner the ability to factually develop that claim consistent with their rights under state law that amounts to an unreasonable determination of the facts under 2254 D2. In Mr. Jones's case the post conviction court denied his request for a neuropsychologist based on its view that there were no grounds for that expert assistance. The court also based its denial of funding on its perception that Dr. Potts did a good job in addressing Mr. Jones's mental health at the sentencing phase. Those findings are objectively unreasonable because the record here shows that the post conviction court had before it plenty of evidence demonstrating that there were grounds for the neuropsychological expert assistance that Mr. Jones was requesting. Specifically the record showed that Dr. Potts' own testimony at sentencing urging this testing provided grounds for Mr. Jones's post conviction request for a neuropsychologist to complete that testing. Dr. Potts was the court's own expert and urged that that testing be undertaken in order to determine definitively whether or not Mr. Jones has brain damage. The record also shows that Dr. Potts was not able to diagnose Mr. Jones either with any kind of mental illness or with brain damage, but rather spoke in terms of possibilities and speculation about what he surmised might be going on with Mr. Jones from a mental health standpoint. The record also showed that post conviction court where he explained that without this expert assistance, Mr. Jones simply would not be able to demonstrate his entitlement relief on these issues. After preventing Mr. Jones from being able to factually develop and prove these claims, the post conviction court went on to deny them on the merits, finding that counsel was not ineffective because in the court's view, Dr. Potts was a good expert and adequately addressed Mr. Jones's mental health at sentencing. Those findings are objectively unreasonable, not only because the post conviction made them while at the same time denying Mr. Jones the ability to present and develop evidence to rebut those findings, but also those findings are squarely contradicted by the record that was before the post conviction court. That record showed that Dr. Potts did not adequately address Mr. Jones's mental health because Dr. Potts made no mental health diagnoses whatsoever. Dr. Potts did not diagnose Mr. Jones with brain damage and significantly neither the sentencer nor the Arizona Supreme Court on independent review found mental illness or brain damage as non statutory mitigating circumstances. Specifically, the Arizona Supreme Court rejected mental illness as being proved based on its view that there was no evidence in the record below to support that non statutory mitigator. The potential for rehabilitation was also rejected both by the sentencing court and the Arizona Supreme Court on independent review. So the record here simply does not support the state court's finding that Mr. Jones's mental health was adequately addressed. In fact, it wasn't addressed at all. In finding that counsel was not ineffective, the post conviction court went on to ignore evidence before it demonstrating that there were numerous red flags in the information that counsel had prior to the sentencing proceeding that should have signaled to reasonable counsel the need to address his mental health and the potential for brain damage by bringing in an expert. Counsel? Yes. Did your client serve in the military? Yes, Your Honor, he did. Which branch? He served in the Marine Corps. And he suffered a mugging when he was on active duty? Yes, Your Honor. And was there any, in his medical records, any indication of treatment at a naval hospital or such for those injuries? Yes, Your Honor. The 1983 medical records document the fact that when Mr. Jones was stationed in Camp Lejeune, North Carolina, he was hospitalized after he was found mugged and unconscious. And so they do note that he sustained an injury. Counsel introduced those records belatedly after sentencing on the day the court was scheduled to pronounce Mr. Jones's sentence as corroboration for a head injury he sustained during that incident. But at that point, it was too late because the court had already passed a mitigation hearing. And as the court stated, you know, it was simply too late for counsel to use these records to try to urge a continuance request at that time. When, and you're now talking about the receding ZET trial in Mojave County? Yes, Your Honor. And the trial defense counsel had all these records? Yes, Your Honor. Okay. But didn't present them until the actual date of sentencing? Well, the record shows that counsel did not seek to introduce the 1983 military records documenting Mr. Jones's head injury until the day after sentencing, when the court was ready to pronounce Mr. Jones's sentence. The record before the post-conviction court also shows that counsel did have Mr. Jones's hospitalization in the late 1980s at the Nevada Mental Health Institute in connection with a suicide attempt. Counsel testified at the post-conviction hearing that he had those records as early as two months after his appointment to Mr. Jones's case. Those records document that Mr. Jones was hospitalized as a mentally ill person, that he experienced explosive outbursts of rage, that he told the provider that he had a difficult time keeping himself under control, even when not consuming drugs and alcohol, that he was afraid of what was happening to him. And he didn't understand why for the past six years, he had become increasingly moody. So counsel, although he had these records, did not follow the red flags in them in the year and a half before the sentencing proceeding here. Well, irrespective of the time of presentation, when it was presented to the court just prior to sentencing, did trial defense counsel ever cite Porter versus McCullough? No, Your Honor. And that's all I have. Thank you. I just have a related question. Were either of those sets of records given to Dr. Potts? The Nevada Mental Health Institute records, Your Honor, were given to Dr. Potts. And not the other set of records? And no, not the other set of records. The 1983 records were admitted as an exhibit on the day that the court was scheduled to hand down Mr. Jones's sentence. But I'm just not asking about admitting to the court. I just want to know if Dr. Potts had them on you. I think you've answered the question. Okay. Oh, if I understand you correctly. Thank you. You're welcome. Just one final question about military service. Was Mr. Jones ever deployed in combat? He was not deployed in combat, Your Honor. Okay. Thank you. You're welcome. So in finding that counsel was not ineffective, the post conviction court did not engage with the evidence it had before it, demonstrating that there were red flags pointing to the need to investigate brain damage and mental health. The information... If we agree with you on prong one of Strickland, then what? If you agree with us on prong one, Your Honor, then this court can review Mr. Jones's IAC claims de novo, because the state court did not address the Strickland prejudice prong. And so under Wiggins, Rumpia, Porter, this court applies de novo review to... Right. And is it your contention that that means because we're reviewing de novo that we're entitled to consider all the evidence presented in the federal court? Yes, Your Honor. Under Hurls versus Ryan, Brumfield versus Kane, and under Pinholster itself, the Supreme Court contemplated that a federal habeas court could consider new evidence on de novo review of a claim where 2254D is overcome on the basis of the state court record. Mr. Jones's mother testified at the post-conviction hearing that she informed counsel as early as July of 1992 that Mr. Jones had experienced head trauma as a result of a difficult birth, head injuries that he sustained throughout his childhood, that he was treated with became moody, and that his moodiness was successfully treated with lithium. The 1993 pre-sentence report, which was an exhibit at the sentencing proceeding, also documented the fact that Mr. Jones underwent psychiatric treatments as a child. Counsel had that information as early as December 1st, a week before the sentencing hearing on December 8th, and did not follow that up by trying to get in an expert to explore what was going on with Mr. Jones's mental health. Dr. Sparks, an addictionologist who trial counsel hired specifically for the guilt stage to support a diminished capacity defense, testified at the first stage of Mr. Jones's trial that long-term prolonged substance abuse can, in general, cause damage to the brain's neurons. Notwithstanding counsel's awareness of Mr. Jones's long-term substance abuse history, including throughout the developmental period as a child, counsel failed to follow that up by bringing in an expert to determine whether or not Mr. Jones's brain damaged. In finding counsel not ineffective for failing to introduce additional mitigation at sentencing, because that information in the post-conviction court's view would have been redundant. The post-conviction court ignored records that counsel had and did not use affirmatively on Mr. Jones's behalf, like the Nevada mental health records, which would have supported a finding by the Arizona Supreme Court that Mr. Jones is mentally ill and that should be considered non-statutory mitigation, but also failed to engage with the records that post-conviction counsel introduced at the hearing, including Mr. Jones's eighth grade school records, showing that he was performing between two and four years behind his peers in core academic subjects that would have provided documentary support for Dr. Potts' speculation that Mr. Jones was experiencing cognitive dysfunctions as a result of traumatic brain injury. Have counsel, have you undertaken any kind of broad analysis of what was presented in trial court in this case and what was presented in Penn Holster? Your honor, when you say, have I undertaken a broad analysis, in Penn Holster, maybe the right way to ask the question, I'm sorry, is how does the defense presentation in this case compare with the trial defense presentation in Penn Holster? Would you say that more was presented in one or are they about the same? I would say more. Well, I would say that more was presented in Mr. Jones's case at sentencing because in Penn Holster, the Supreme Court, as I recall, found that counsel's failure to introduce mitigation at all was reasonably strategic because of the profound aggravation in the client's risk opening up by presenting mitigation. So here, counsel did present some things in Mr. Jones's defense. He presented the testimony of Randy Jones, his second stepfather, who testified about abuse that Mr. Jones sustained at the hands of his earlier stepfathers and biological father before the age of six. So it sounds like more was presented here than in Penn Holster, which the court found adequate, although there was a reason for it in Penn Holster. Yes, because significantly in Penn Holster, the court found that counsel's investigation was adequate and strategically based in light of what counsel had and in light of what counsel knew about his client's history. Whereas in Mr. Jones's case, when you look at the information in counsel's possession as early as two months after his appointment to represent Mr. Jones, it's clear that counsel simply didn't realize the significance of the information that he had pointing to the need to investigate the potential for mental illness and brain damage. That I think is probably best reflected in counsel's own statements to the sentencing court in urging a continuance where he says to the judge, your counsel's, there were indicators of brain damage and mental illness in the record that I had, this kind of investigation must be undertaken to ensure reliability in a capital case. So their counsel articulated the relevant standard of care that he acknowledged he did not adhere to. The record here shows that no reasonable jurist could conclude that the state court got it right when it found that counsel's investigation and preparation for the penalty phase of a capital case was constitutionally adequate beyond the unreasonable factual determinations on which the state court premised its denial of these claims. The court also unreasonably applied Strickland and the subsequent cases interpreting it significantly Terry Williams versus Taylor, which was clearly established at the time of the post-conviction court's adjudication of these claims, but also Wiggins, Porter, Frampia, cases which set forth a duty to investigate and present all reasonably available mitigation on a client's behalf to ensure that a client's eighth amendment rights are respected at sentencing and that the death sentence is reliable. Because the post-conviction court's adjudication of these claims is patently unreasonable, whether under D2 or under D1, this court will review Mr. Jones' IAC claims de novo and consider the evidence presented at the federal hearing, demonstrating the significant and compelling mitigation that the in assessing Mr. Jones' moral culpability. On de novo review of these issues, this court's confidence in the outcome of Mr. Jones' sentencing and in the reliability of his death sentences should be undermined because the sentencer was deprived of mitigating evidence without which it simply couldn't assess his moral culpability for these crimes in a reliable way. For instance, the sentencer never knew that Mr. Jones has brain damage as a result of his traumatic birth, head injuries sustained throughout his childhood, and his long-term substance abuse. The sentencer didn't know that Mr. Jones has post-traumatic stress disorder because of chronic physical and sexual abuse that he sustained beyond the age of six and throughout his youth and approaching stressful situations with a kind of combat readiness and explosiveness that could have provided support for the G1 statutory mitigating circumstance that the sentencing court found not proved significantly because it found that there was no evidence that Mr. Jones' crimes were the product of a mental impairment or anger explosion. The sentencer never knew that Mr. Jones' early substance abuse was not simply due to the fact that he made bad choices, but rather was a way to self-medicate the symptoms of untreated trauma and undiagnosed mental illness. This evidence is not only independently mitigating, but particularly so because it bore a causal nexus to the crimes here. As Dr. Stewart explained in his report, Dr. Jones was the first person to be hired in federal habeas proceedings and who authored a report and testified at the federal hearing. If I could just quote him briefly, the result of Mr. Jones' mental illnesses, biological, environmental, social, and other compromising factors culminated in, at the time of the murders, an impairment in Danny's ability to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law. In other words, his conduct, for all of the reasons stated in this report, was out of control, impulsive, and once he started, he simply could not stop. The evidence of Mr. Jones' mental and emotional impairments would have radically altered the sentencing profile here, undermining several of the statutory aggravators, including F-5, the pecuniary gain aggravator, the senselessness component of F-6, and would have also explained that Mr. Jones' conduct was not because he had a sadistic and vile state of mind, but rather was the result of not only his intoxication with amphetamines, but also as a result of his organic brain impairments. If the court does not have any additional questions about these issues, I would ask to reserve the remainder of my time for rebuttal, if possible. Certainly. Thank you. We'll hear from the state. Sparks. Good afternoon. May it please the court. Assistant Arizona Attorney General, Jeff Sparks, on behalf of Respondents at Police. I agree that the two questions, the two large questions before the court in this case on the ineffectiveness claims are, was the state rejection of those claims reasonable under section 2254 D as the first question. And as the Supreme court stated in Harrington v. Richter, the statute sets a very high bar for a habeas petitioner to meet. The state court's decision here was reasonable based on the facts before it at the time. Counsel did present evidence of Jones's mental health issues, um, by moving for a mental health examination prior to sentencing, which occurred, uh, Dr. Potts was appointed and in fact, counsel, because of the way this was done, rather than hiring an expert, um, to serve as a, I guess, quote defense expert, um, as, as is sometimes done by asking for the appointment of Dr. Potts and proceeding that way. Counsel was at a strategic advantage when it came to sentencing because the state. Then wasn't prompted to hire an expert of its own who would testify potentially in rebuttal to a defense experts findings. So instead counsel was able to present Dr. Potts at the sentencing hearing, um, testifying rather than as a hired expert, but as a court appointed expert. Um, so with that kind of, uh, additional gloss of neutrality and who was able to present testimony that, um, gave the sentencing court substantial evidence of mitigating factors going through, um, Jones's abusive and difficult childhood, which Dr. Potts testified about his history of head injuries, Dr. Potts went into the potential effects that those types of head injuries would have specifically referencing, uh, potentially making him more prone to aggressive and violent outbursts. Didn't Dr. Potts, while he was on the stand, say that he would have liked to have had more time, see more testing and, uh, to determine possible evidence of traumatic brain injury. That's correct. Your honor, Dr. Potts did testify to that. However, it was reasonable for the trial court, both to deny the continuance at that time of sentencing. And then also in the, in the post conviction context to conclude that Dr. able to, um, present Jones's mental health issues. And that's because Dr. Potts said that he believed that the additional testing would, would help him to essentially bolster his conclusions and offer a firm diagnosis of why the things he was seeing in Jones were caused by, but he did say he would like to hear more and see more. That's correct. Your honor.  In this case, the same judge who tried the case and sentenced, uh, Jones to death, um, was the judge who did the PCR. Is that common in out counties? That is the standard practice throughout Arizona. Generally under the post conviction rules, if the trial judge is available or is still on the bench, then that judge generally will preside over the post conviction proceeding. When he was, uh, the trial judge, Judge Chavez was trying to determine whether there was merit, uh, to the argument of requiring more testing, et cetera, um, he reflected back to what he remembered at the trial. And he thought Dr. Potts was a good witness, right? That's correct. Your honor. And he, the trial record indicates that, and this is Kingman, it's not the largest metropolitan city in the world. He knew Dr. Potts. I believe that is correct. Your honor. Yes. And he knew that, uh, uh, Potts had an inclination to be pro defense. I, I, yeah, I believe there was suggestion of that in the record. I know that, uh, the prosecutor, for example, was essentially making arguments along those lines, uh, at the sentence hearing. Okay. Thank you. Go ahead. Actually, I have a couple of questions on this point before you proceed, if I might. The trial court, or PCR court had to know that the report was only produced a few days, uh, before he testified, right? There was very little time for defense counsel to do anything with it. Right. I mean, uh, yeah, it would have been apparent to the court because of the date of appointment that, yeah, it only could have been in that window of time that the report was prepared. Right. And, uh, there were very few witnesses presented. So the court would also been aware of the extent of trial counsel's factual investigation to family history. I believe so. Yes. I mean, to the extent that the court could see that based on the number of witnesses and amount of information presented, then yes. And the records that we were just discussing, um, not all of them were presented to Dr. Potts, particularly the military records where he was found unconscious, having been mugged, but the district court knew that because they were presented at the last minute to the district court. Right. Yes. Right. And are you referring to the sentencing court, the sentencing judge? I am. Oh, okay. Then yes. Does the court did have PCR court would be in a position to recognize that that was not factored into Dr. Potts's report is what I'm trying to get at. And I want to give you a chance to respond because that's my read of the chronology. Have I got that wrong? No, your honor. That, that chronology is correct. Thank you. You're welcome. Your honor. Um, and I don't think there's one other thing. The other thing we know now is that Dr. Potts had no idea that as far as he knew, um, uh, Jones had a happy childhood after age eight and had no idea that there had ever been sexual abuse. Is that right? That's right. That was the information that, um, the witnesses testified to at the suggestion that Dr. Potts heard otherwise correct. Your honor. There was no suggestion that, that Jones himself told Dr. Potts otherwise, uh, in his evaluation of him. But there's another entry in the record that I don't understand. And that's a, that's an entry, I think, in a pre-sentence report that indicates that, that Jones himself may have, may have reported that his childhood was unhappy and, uh, um, perhaps he'd even suffered abuse. And I think during the time that Potts was on this witness stand, defense counsel suggested to him that that would, must have been a mistake. Is that right? There was a, yeah, a suggestion along those lines. However, there, the stepfather, Randy, um, Jones did testify at the sentencing hearing that the, that Jones's prior, his first stepfather had abused him and, and Jones's mother as well. Right. But the picture was that it was the prior stepfather that had abused him, that it had ended when Peggy married, um, Randy, forgive me for using their first names, um, right. So that it hadn't continued past about age eight and no indication here that, that Dr. Potts had any idea that this child had been, then child, forgive me, had been subjected to years of sexual abuse. Is that fair? That is fair, Your Honor. It is. Thank you. Addressing the, uh, the military records that the, that were presented to the sentencing judge, however, had not been in front of Dr. Potts, there's on this record, there's no suggestion that that would have made a difference. Dr. Potts did have information of other head injuries that Jones had apparently suffered throughout childhood and his teen years and specifically testified to the effect that those would have caused and did tie that to his, his, uh, history of substance abuse as well. So I don't think there's any suggestion on this record here that having access to the record of the mugging that Jones suffered in the military would have changed Dr. Potts's opinion in any way. And I don't believe he testified. Um, I'm sorry. And I got ahead of myself. He testified at the federal hearing, not the post-conviction hearing. Um, But he didn't have the sentencing judge. Did not, was not cited to Porter versus McCollum? I don't believe that he was correct, Your Honor. And a double murder case. Now the military service in that case included active duty, frontline, face-to-face combat, uh, in North Korea. Um, but it stands for the broad proposition that consideration of military records and service are part of the process of mitigating, uh, civilian committed crimes, right? Broadly. Yes, Your Honor. I've always, um, interpreted that decision as, as putting a serious mitigating weight on the specific nature of the defendant's, uh, military record in that case, specifically the, the horrific, um, combat conditions that he encountered and endured. And, and I read that decision as, um, emphasizing the weight that that given those specific facts, however, here, um, you know, even under the broader interpretation that, that generally records of military service are considered important mitigate mitigation evidence, um, the sentencing court had that information in front of it while it was presented, um, after the sentencing hearing, it was presented to the sentencing court before pronouncement of sentence and the transcript of the proceedings that day are clear that the court had received them in, in the morning. Um, in fact, there's even a reference to an off the record discussion between counsel and the judge where the judge said, and as I indicated before, I, I received those, I reviewed them and I I'm taking them into consideration in my decision. Have you looked at those records? I have looked at them, Your Honor. Yes. Uh, does it determine where he, uh, Jones was mugged? Your Honor, if I recall correctly, I believe it was, um, on or nearby the base where he was stationed. And the information is that he was essentially found, um, unconscious or semi-conscious, um, and stated that he had been mugged. There was also evidence, um, at the time that he was intoxicated with alcohol as well. Um, but that's, that's essentially the thrust of the records. Did the records show whether there was a CID or NCIS investigation? Your Honor, I can't, I just can't specifically recall whether they did or not. I'm sorry. Do the records indicate whether the Marine Corps determined whether he was partially or otherwise at fault for what happened to him? I don't believe that they do. Well, I mean, there, there is conclusion that he was of alcohol intoxication. So, I mean, to the extent that his intoxication played a role in what led him to be found in that unconscious or semi-conscious state, then, then I think alcohol seems to have played a role, at least some role in that, but we don't know how much. Sometimes drunks make great targets. Would you concede that? I would, Your Honor. I would, Your Honor. Okay. That's all I have for now. Go right ahead. Okay. So I think ultimately the, the information from those records is, is somewhat ambiguous. Obviously he suffered some kind of an incident, but it's unclear. He states it was a mugging. Um, but either way, that was information that the sentencing court had in front of it and was relevant to its determination in the post-conviction proceeding of whether trial counsel had performed efficiently, uh, or whether Jones is prejudiced. And I'd like to address the argument that there was no state court finding on prejudice. I would, I would, uh, dispute that argument. The Supreme court has stated in cases like Harrington v. Richter, that there's a presumption, a rebuttable presumption, but a presumption nonetheless of a merits adjudication when a state court hears a federal claim now, while the court in his post-conviction order did specifically state that Jones failed to meet his burden of proving deficient performance. The court also addressed the evidence and the witnesses specifically, for example, the court stated that Dr. Potts had adequately addressed Jones's mental health issues at sentencing. That kind of a finding goes directly to Strickland prejudice and whether there's a reasonable outcome, a reasonable probability of a different outcome, um, had counsel not allegedly performed efficiently. Similarly to the claim where Jones had asserted that additional evidence and records should have been presented. The court stated that the additional evidence Jones suggested should have been presented would have been redundant. That conclusion also necessarily goes into a, a Strickland prejudice finding of whether there's a reasonable probability of a different outcome. So applying, counsel, did you say necessarily goes into prongtive? Yes, your honor. I think it does. I think it could potentially be relevant to deficient performance, but it's just as relevant to a prejudice determination. So you don't mean necessarily, you mean consistent with, I'm not trying to, I'm trying to understand. No, I would agree with you, your honor. Yes. Consistently would be a better choice of words. You would agree there was no prejudice finding. I would agree the court is the word prejudice and the words prejudice is not in the, in the ruling. No, your honor. It is not. And, and when, and the bottom line of the superior court's decision says that the court finds the petitioner has not met his burden of proof of showing deficient performance by trial counsel. So what in that statement leads you to believe that the court was making a prejudice? Well, your honor, it's not that statement that I, that I believe shows that the trial court made a prejudice finding or the post-conviction court. It's the other statements I referred to regarding the redundancy of the adequacy with which he addressed Jones's mental health issues. I believe those are consistent with a finding that there was no prejudice. So for the, for those reasons and those in the brief, it's our position that the state court reasonably rejected the three ineffective assistance claims. Assuming this court were to get to de novo review on these claims, the, the district court, after the evidentiary hearing made a specific and thorough factual findings and those factual findings require deference unless Jones shows they were clear error and he hasn't done so here, I think the most important of those findings that the district court made here first was that it failed to prove that he actually suffers from cognitive impairment or dysfunction as the district court noted, his experts relied mostly on his school performance and on discrepancies in his, some of his testing scores to, to conclude that he suffered from cognitive impairment or dysfunction resulting from brain damage. However, as the district court pointed out, the school performance also has other equally plausible explanations, such as absenteeism, family stress, substance abuse, lack of motivation, things along those lines. The district court also noted Dr. Herring, one of, one of Jones's experts testimony that the majority of his test scores were within the average range, that gaps between IQ scores are not uncommon and the higher score that Jones received on the performance subtest and the fact that his overall IQ was in the average range weighs against any impairment. Additionally, the district court made a finding that the, the, the testimony at the hearing established that the fact that Jones's few lower scores were not in any, were not clustered in a particular domain also suggests that they were aberrations rather than evidence of impairment or brain damage. As far as the other conditions, the district court found that there was no definitive testimony that Jones suffered from PTSD at the time of the murder. The court made specific findings regarding that conclusion based on the expert testimony. The court also found that Jones actually at the federal hearing failed to prove a mood disorder. And that was largely based on the district courts noting that there was no evidence of mania or hypomania. The most, the district court credited Jones with proving a possible low level disorder such as dysthymia. And again, taking that back to the sentencing hearing, Dr. Potts was able to testify that it was likely or possible that Jones suffered from a bipolar disorder. And again, there Dr. Potts was able to present that testimony without rebuttal testimony from a state expert because of the way he was appointed and his testimony was presented. Whereas in the federal hearing, when the state was able to present witnesses, expert witnesses in rebuttal to Jones's experts, they were able to challenge Jones's experts findings that he suffered from a bipolar disorder. So based on those factual findings, which again, required deference, unless they are shown to be clear error, the district court found that there was no prejudice from trial counsel's failure to either timely request the testing that Dr. Potts referred to, or to have hired a, a quote defense expert to assist in the development presentation of mental health evidence at sentencing. Additionally, addressing the, the claim that trial counsel failed to present evidence of additional abuse by Randy Jones and also sexual abuse by Jones's grandfather. The only witness that provided the evidence of sexual abuse was Jones's sister. The record is clear that trial counsel interviewed Jones, interviewed Jones's stepfather, Randy, his second stepfather, Randy Jones, as well as Jones's mother. And there's no suggestion anywhere in the record that any of those witnesses gave counsel any information that would have suggested to counsel that Jones had been sexually abused or that his sister, which appears to be the one family member that trial counsel did not talk to before sentencing, had information that the other three did not. So based on that, the district court concluded that there was no deficient performance and failure to uncover that information, presumably that was information that Jones himself would have had, and there's no suggestion that Jones provided that information to counsel or Dr. Potts either. But what about the, if you could go back, I just want to hear your um, um, Jones's own description in the pre-sentence report that his counsel then said, oh, this must be a mistake rather than check it. Seemingly, rather than checking with Jones, because, because, because the record is extraordinary. That once somebody asked his sister, all these cards fell into place. She was very forthcoming. And in fact, even I'll use, since you did, um, Randy, the first name didn't deny the physical abuse. It seems to me once he was, he was challenged with it. And then of course, um, Mr. Jones came forward with the, um, pretty horrendous stories of sexual abuse as a child. So it's very concerning to me that there's no indication that defense counsel followed up on that indication and pre-sentence report, other than to suggest himself that it was a mistake. Your honor. I, I think the problem I have with that, um, and, and faulting counsel for not potentially following up on that is, is it really is ambiguous. Um, we don't know specifically what, what Jones had said to Dr. Potts. Um, and we don't know whether or not there was follow-up with Jones himself. There that information. Dr. Potts didn't spend very much time with Jones. We know that much. Right. And we know that although his parents, mom and stepfather described everything being happy in their home after age eight, that there's an indication in the pre-sentence report that that's not how Mr. Jones described things. That's, that's my problem. I under, I understand your honor. Um, however, there's no evidence on, I mean, for, for all we know on this record, counsel did follow up with Jones, but we don't know what conversation fell out of that. There was no declaration or affidavit presented from Jones, um, either in post-conviction or in district court, um, regarding what, what they discussed or didn't discuss with counsel. And there was nothing presented from trial counsel regarding what, uh, you know, what follow-up did or did not occur. So I think under Strickland's, uh, presumption of a reasonable performance, there simply isn't enough information there to make a conclusion that counsel was deficient. Finally, um, in cases like Wong v. Belmontes, the Supreme court has stated that, um, when assessing this type of a claim in the mitigation context, in effective assistance, and specifically the prejudice prong, um, it's not only, a court must not only take into   account the mitigation evidence that was presented in sentencing and the additional mitigation that a defendant is arguing should also have been presented to the sentencing judge or jury. Uh, but also the court must take into account all of the, the aggravating evidence in the record. And here the, the aggravating factors are there, there are, are numerous and they're very strong. Um, I, I believe that the, the multiple murders, aggravating circumstances, one that the Arizona Supreme court has always afforded great weight. And I also believe that the, the young age of the seven-year-old, uh, victim, um, is also a very weighty aggravating factor and, you know, assuming for a minute, and again, I think the district court made clear and very supportable findings that Jones had failed to conclusively prove, um, cognitive impairment, but even assuming that, that I think the general thrust of his you know, and, and I think this is based on the fact that we don't have definitive, definitive evidence of what prompted, um, him to attack Randy Weaver in the garage, um, on the day the crimes were committed. Um, and I think the thrust of Jones's mitigation case, or at least part of it is that he suffered, uh, an explosive outburst potentially based on, you know, the issues that he, uh, you know, suffered from cognitive impairment, substance abuse, those types of things. So I think at very most, even assuming Jones had proven those conditions and that he was suffering from them at the time of the crimes, at the very most, he may be able to show, you know, some mitigation as to that first murder. However, I don't think on this record, anything adequately comes close to explaining why he then entered the house, attacked, uh, the grandmother, and then followed the seven-year-old child into her room, dragged her out from under a bed, hit her with a bat and strangled her to death. Now, of course, we all know that mitigation isn't required to be causally connected to a crime to be considered. It still deserves consideration as mitigation. However, as a district court noted, that can affect the weight that is afforded to that mitigation. And none of the mitigation he presented, um, I don't believe on the, on this record comes close to explaining those additional actions. Um, and I think that's under the Supreme Court jurisprudence, those aggravating facts have to play a role in the determination of whether, um, a defendant shows strickland prejudice. So I think even, even giving, you know, credence to his mitigating evidence and the additional mitigating evidence that he presented at the hearing at district court, the aggravation is so strong that the district court was, uh, correct in concluding that Jones failed to show a reasonable probability that he would have been sentenced to life had the sentencing court had that additional information in front of it. And unless there are any further questions, I would ask this court to affirm the district court's, uh, ruling. Thank you. Thank you, counsel. We'll hear from Ronald. Before I lose you, I have one quick question. In the records of his military service, was, uh, did those records, uh, contain a DD 214 evidence of the nature of his discharge, where and how he served? I can answer, uh, the nature of the discharge, your honor. I believe they did indicate that there was a dishonorable discharge. As far as the additional information, I, I I'm sorry, your honor. I do not recall. It's a dishonorable discharge. I believe, I, as far as I recollect, I believe that's true, your honor. Okay. Thank you. Judge Hawkins, just going to your last question, um, his records documented a bad conduct discharge related to his court-martial in connection with a theft. Um, what was it, what was he court-martialed for? It was for theft. He was accused and court-martialed for stealing. Uh, I believe it was around. So he went through a special court-martial? Yes, your honor. And received a bad conduct discharge? Yes, your honor. Counsel for the state, it doesn't amount to a hill of beans, but there's a hell of a difference between a bad conduct discharge and a dishonorable discharge. And you should know that. Um, if I could just, um, pick up with, um, Mr. Sparks' defense of the district court's findings here. The district court's findings are tainted by clear error and also legal error. Um, primarily the court, for example, rejected the evidence of PTSD based on its view that it lacked a causal nexus to the crimes, um, in making that, uh, determination, the court ignored, uh, entirely Dr. Stewart's, uh, testimony and, uh, diagnosis that Mr. Jones had post-traumatic stress disorder under the DSM-IV's criteria. And also, uh, Dr. Stewart diagnosed him with complex PTSD as well. The district court also committed the exact same error that this court faulted the district court for committing in Correll versus Ryan by substituting its own subjective assessment of the credibility of Mr. Jones' experts for that of an objective sentencer. Rather than asking whether, uh, in the procedural context of this case, there was a reasonable probability that an objective sentencer could have found Mr. Jones' experts credible and credited their diagnoses, the district court instead, um, substituted its own idiosyncratic view of the credibility of Mr. Jones' experts vis-a-vis respondents' experts, uh, and in that way committed, uh, legal and clear error as well. Um, the court ignored evidence, uh, documentation substantiating that Mr. Jones' history of head injuries was credible. The district court found in its, in its order that there were no, uh, credible instances of head injuries, for example, which ignored not only the 1983 military records, but also the information provided in declarations from Mr. Jones' stepfather, uh, talking about the head injuries that he'd sustained over time. Um, the court also rejected the opinion of Dr. Goldberg, uh, as well as Mr. Jones' treating psychiatrist in ADOC, who both diagnosed Mr. Jones, uh, with bipolar disorder. Uh, Dr. Stewart as well diagnosed Mr. Jones with an unspecified mood disorder. And instead of crediting those or asking whether an objective sentence or could have credited those diagnoses, the court instead found that in its opinion, all Mr. Jones had was mild depression. If I could also just, um, speak to the, the point made by Mr. Sparks, that the evidence of sexual abuse, um, is not something that council could be sharing. Uh, there's no indication that they did, uh, share this with council, um, in, in Andrews versus Davis, this court found that a client and their families cannot be faulted for failing to recognize what information is relevant mitigation and volunteering that when there's no indication that council elicited that information or alerted them to the kind of information that would be relevant in the safe amendment context, um, council, uh, also made the point that, uh, trial council made the strategic choice to rely on a neutral court appointed expert to develop information about Mr. Jones's mental health at sentencing. The logical problem, however, with that argument is that council did not know what Dr. Potts was ultimately going to say, or whether his opinion would be helpful to Mr. Jones until two days before Dr. Potts testified. Um, council stated to the court in moving for a continuance that he simply didn't realize that, um, you know, additional testing that Dr. Potts was recommending, uh, was needed and didn't realize that Dr. Potts's opinion would be helpful. Council, uh, for Mr. Jones testified at the post conviction hearing that it wasn't until December two days before Dr. Potts testified that he saw him as a defense expert. Under Strickland, a capital lawyer cannot make the reasonable strategic choice to forego following up on red flags in the records and in the information that he has pointing to the need to investigate mental health mitigation and brain damage a year and a half before the sentencing proceeding on the off chance that the court appointed expert is going to ultimately say something helpful to his client. That is not the result of reasonable professional judgment and council's own statements to the court here in belatedly urging a continuance request show that. Um, it is also true that, uh, while Mr. Sparks has made much of the fact that Dr. Potts was unrebutted, he was the court's expert. He was neutral. The record simply does not bear that out. The prosecutor aggressively cross-examined Dr. Potts, discrediting his opinion as biased, discrediting his findings based on the absence of objective testing, demonstrating that Mr. Jones has a mental illness, uh, or has brain damage. The court in fact, uh, found that there was no mental illness proved. It rejected Dr. Potts' finding that head injuries gave rise to the potential for brain damage. Um, the court also rejected four out of the seven non-statutory mitigators that Dr. Potts presented in his report. And so it simply is not worn out by the record that the court credited Dr. Potts' findings and that he adequately addressed all of the issues that he sought to develop both in post-conviction proceedings and that he subsequently developed in federal court. Um, Dr. Potts testified at the federal hearing that his role as the court's expert was limited under rule 26.5 to competence to be sentenced and the existence of the G1 statutory mitigator. He was not appointed to undertake an overall assessment of Mr. Jones' mental health and couldn't. And in fact, he found that the expert reports presented in federal court were exhaustive and exactly what he would have wanted to see. So we ask that this court, uh, remand Mr. Jones' case to the district court with instructions to grant the writ. Thank you, counsel. Thank you both for your arguments today and the case will be submitted for decisions. Thank you. Thank you. This court for this session stands adjourned.
judges: Hawkins, Thomas, Christen